| | |
|---|---|
| **CATHERINE EALY-SIMON** and **KRISTIN WILSON**, individually and on behalf of all other similarly situated individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>**CHANGE HEALTHCARE OPERATIONS, LLC**<br><br>    Defendant. | Case No.:<br><br>**COLLECTIVE AND CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs CATHERINE EALY-SIMON and KRISTIN WILSON ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective and Class Action Complaint ("Complaint") against Defendant CHANGE HEALTHCARE OPERATIONS, LLC ("Defendant"), and state as follows:

## INTRODUCTION

1.    This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs, individually and on behalf of all similarly situated persons employed by Defendant, arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, among other laws.

2.    Defendant is in the business of providing call center services. More specifically, Defendant operates an outsourced call center for large physician groups, hospitals and health systems.

3.    In order to provide call center services to its clients, Defendant employs hourly, nonexempt call center employees (hereinafter referred to as "Patient Service Representatives" or

"PSRs") to interact with health plan members through outbound and inbound telephonic contact to review and assess health plan members' eligibility for services.

4. Defendant employs these PSRs in multiple call center facilities located throughout the United States, including Port St. Lucie, Florida.

5. Nonparty Aerotek, Inc. ("Aerotek") provides recruiting and staffing services.

6. Aerotek hired and directly employed Plaintiff Catherine Ealy-Simon ("Plaintiff Ealy-Simon") and assigned her to work for Defendant as a PSR at Defendant's call center facility in Port St. Lucie, Florida. Defendant employed or jointly employed Plaintiff Ealy-Simon and is liable for the wage violations pleaded by Plaintiff Ealy-Simon in this Complaint. Upon information and belief, Aerotek and other staffing companies directly employed dozens, if not hundreds, of employees—including Plaintiff Ealy-Simon—and assigned them to work for Defendant as PSRs at Defendant's call center facilities.

7. Defendant hired and directly employed Plaintiff Kristin Wilson ("Plaintiff Wilson") as a PSR at its call center facility in Port St. Lucie, Florida. Upon information and belief, Defendant hired and directly employed dozens, if not hundreds, of PSRs—including Plaintiff Wilson—at its call center facilities.

8. The United States Department of Labor ("DOL") recognizes that call center jobs, like those held by Plaintiffs and the PSRs, are homogenous, and in July 2008, the DOL issued Fact Sheet #64 to alert call center employees to some of the abuses that are prevalent in the industry. (*See* DOL Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA), available at https://www.dol.gov/whd/regs/compliance/whdfs64.pdf.) One of those abuses, which is occurring in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." (*Id*. at 2.)

9. More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails." (*Id.*) Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." (*Id.*)

10. Defendant requires its PSRs to work a full-time schedule, plus overtime. However, Defendant does not compensate the PSRs for all hours worked; instead, Defendant requires the PSRs to perform compensable work tasks before and after their shifts and during their unpaid meal periods, but compensates the PSRs only for the time they are connected to Defendant's phone system and are available to make/take customer calls, meaning that the PSRs are only paid for time spent on the phones and are not paid for any time spent turning on their computers and launching the computer networks, software programs, applications and phone systems necessary for the performance of their work. These policies result in PSRs not being paid for all time worked, including overtime.

11. In the course of performing their job responsibilities, the PSRs use multiple essential computer networks, software programs, applications and phone systems. The time PSRs spend booting up and shutting down their computers and launching and logging into the programs and applications before and after their scheduled shifts is compensable because the programs and applications are an integral, indispensable and important part of the PSRs' work, and they cannot perform their jobs effectively without them.

12. The PSRs perform the same basic job duties and are required to utilize the same or similar computer networks, software programs, applications and phone systems.

13.     The individuals Plaintiffs seek to represent in this action are current and former PSRs who worked for Defendant and are similarly situated to each other in terms of their positions, job duties, pay structure and Defendant's violations of federal and state law.

14.     The PSRs' job duties and responsibilities, as well as the computer networks, software programs, applications and phone systems they are required to utilize during their shifts, are substantially the same, irrespective of their particular job title or the call center facility they are assigned to, which is to say that the PSRs are similarly situated to each other irrespective of their job title or the location of the call center at which they perform their work.

15.     Defendant knew or could have easily determined how long it takes the PSRs to complete their off-the-clock work, and Defendant could have properly compensated Plaintiffs and the PSRs for this work, but deliberately chose not to.

16.     Plaintiffs seek a declaration that their rights and the rights of the putative collective/class members were violated, an award of unpaid wages and liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## **JURISDICTION**

17.     This Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. § 201 *et seq.*

18.     Additionally, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

19.     Moreover, this Court has original jurisdiction over this action pursuant to the Class

4

Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 class members, and at least some members of the proposed class have a different citizenship than Defendant.

20.     Defendant's annual sales exceed $500,000, and Defendant has more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendant's employees engage in interstate commerce or in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

21.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims and the federal claims are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

22.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     The Court has personal jurisdiction over Defendant because Defendant conducts business in Tennessee, maintains its principal place of business in Tennessee,[1] employs individuals in Tennessee, is registered with the Tennessee Secretary of State, and generally engages in substantial activities in Tennessee.

24.     Personal jurisdiction also applies to Defendant because Defendant has purposefully availed itself of the privilege of conducting activities in Tennessee and has established minimum contacts sufficient to confer jurisdiction over it; and the assumption of jurisdiction over Defendant

---

[1] "With respect to a corporation, the place of incorporation and principal place of business are the paradigm bases for general [personal] jurisdiction." *TailGate Beer, LLC v. Blvd. Brewing Co.*, 3:18-CV-00563, 2019 WL 2366948, at *2 (M.D. Tenn. June 5, 2019) (citations omitted).

will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

## VENUE

25.     Venue is proper in the Middle District of Tennessee under 28 U.S.C. §§ 1391(b)(1)-(2) because Defendant maintains its principal place of business in Nashville, Tennessee, and a substantial part of the events forming the basis of this suit (including implementation of the illegal pay practices alleged in this litigation) occurred in the Middle District of Tennessee.

## INTRADISTRICT ASSIGNMENT

26.     Defendant maintains its principal place of business in Nashville, Tennessee, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Nashville, Tennessee; therefore, this action is properly assigned to the Nashville Division.

## PARTIES

27.     Plaintiff CATHERINE EALY-SIMON is a Florida resident who was directly employed by Aerotek and was assigned to work for Defendant as a PSR at Defendant's call center facility in Port St. Lucie, Florida from September 2019 to March 2020. Plaintiff Ealy-Simon was compensated for her call center work through the payment of an hourly wage, most recently at the rate of $12.00 per hour. Plaintiff Ealy-Simon signed a consent form to join this collective action lawsuit, attached hereto as **Exhibit A**.

28.     Plaintiff KRISTIN WILSON is a Florida resident who has been directly employed by Defendant as a PSR at Defendant's call center facility in Port St. Lucie, Florida since November 2019. Plaintiff Wilson is compensated for her call center work through the payment of an hourly wage, most recently at the rate of $12.75 per hour. Plaintiff Wilson is currently on medical leave. Plaintiff Wilson signed a consent form to join this collective action lawsuit, attached hereto as

**Exhibit B**.

29.     Defendant CHANGE HEALTHCARE OPERATIONS, LLC is a Delaware Corporation (File Number: 4237148) with a Principal Office at 3055 Lebanon Pike, Suite 1000, Nashville, Tennessee 37214-2239. Defendant is licensed to do business in Tennessee (Control # 000921933), and its registered agent for service of process in Tennessee is C T Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

30.     According to its website, Defendant operates "an outsourced call center for large physician groups, hospitals and health systems that want to create an exceptional patient experience that improves satisfaction, reduces leakage, and drives revenue." (https://www.changehealthcare.com/solutions/revenue-cycle-management/patient-access-financial-clearance/patient-access-center-services (last visited June 4, 2020).)

31.     Upon information and belief, Defendant has employed hundreds of PSRs—including Plaintiffs—during the last three years to perform services that include interacting with health plan members through outbound and inbound telephonic contact to review and assess health plan members' eligibility for services.

## JOINT EMPLOYER ALLEGATIONS

32.     Defendant employed or jointly employed Plaintiff Ealy-Simon and every other PSR who was hired and directly employed by Aerotek or other staffing companies and who were assigned to work for Defendant as PSRs at Defendant's call center facilities.

33.     Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee…." 29 U.S.C. § 203(d).

34.     "Courts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act."

*Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) (footnote and citations omitted).

35.　Congress defined "employee" as "any individual employed by an employer", 29 U.S.C. § 203(e)(1), describing this language as "the broadest definition that has ever been included in any one act." *U.S. v. Rosenwasser*, 323 U.S. 360, 363 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo Black)); *Tony and Susan Alamo Found. v. Sec. of Lab.*, 471 U.S. 290, 300 (1985) (same).

36.　The determination of whether an employer-employee relationship exists "does not depend on isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The touchstone is "economic reality." *Goldberg v. Whitaker H. Co-op., Inc.*, 366 U.S. 28, 33 (1961).

37.　Two or more employers may jointly employ someone for purposes of the FLSA. *Falk v. Brennan,* 414 U.S. 190, 195 (1973). All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. § 791.2(a).

38.　Regulations issued by the DOL give the following example of a joint employer scenario:

> [T]he employee has an employer who suffers, permits, or otherwise employs the employee to work, but another person simultaneously benefits from that work. The other person is the employee's joint employer only if that person is acting directly or indirectly in the interest of the employer in relation to the employee.

C.F.R. § 791.2(a)(1) (citation omitted).

39.　The ultimate question of whether a party is an "employer" is a legal issue. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469-70 (9th Cir. 1983). The ultimate determination must be based "upon the circumstances of the whole activity." *Id.* at 1470 (citing *Rutherford*, 331 U.S. at 722).

8

40.     Aerotek hired and directly employed Plaintiff Ealy-Simon and assigned her to work for Defendant as a PSR at Defendant's call center facility in Port St. Lucie, Florida.

41.     Defendant employed or jointly employed Plaintiff Ealy-Simon because, *inter alia*, Defendant had the power to fire – and did fire – Plaintiff Ealy-Simon.

42.     Furthermore, Defendant supervised and controlled Plaintiff Ealy-Simon's work schedule and conditions of employment, for example, Defendant required Plaintiff Ealy-Simon to work a standard eight-hour shift (with one unpaid 30-minute meal period) five days per week and required her to be connected to Defendant's phone system promptly at the start of her scheduled shifts so that she was ready to make/take customer calls at the moment her shifts began. If Plaintiff Ealy-Simon refused to do so, she was subject to penalties and disciplinary action at the hands of Defendant, including but not limited to: written and verbal reprimands, suspension or termination.

43.     Plaintiff Ealy-Simon directly reported to Defendant's managers and supervisors, who closely supervised and scrutinized her work.

44.     Plaintiff Ealy-Simon was trained by Defendant to perform the call center services that she carried out each and every day for Defendant's benefit.

45.     Defendant expressly prohibited Plaintiff Ealy-Simon from taking meal or rest breaks outside of her assigned break period times and required her to be connected to Defendant's phone system promptly at the end of her scheduled break periods so that she was ready to resume making/taking customer calls at the moment her break periods ended. If Plaintiff Ealy-Simon refused to do so, she was subject to penalties and disciplinary action at the hands of Defendant, including but not limited to: written and verbal reprimands, suspension or termination.

46.     Defendant required Plaintiff Ealy-Simon to adhere to mandatory performance and quality metrics, or else she was ineligible for incentive compensation and was subject to penalties

and disciplinary action, which again included written and verbal reprimands, suspension or termination.

47.     Defendant furnished Plaintiff Ealy-Simon with Defendant's 401(k) Savings Plan Enrollment Guide and a Summary Plan Description of Defendant's 401(K) Savings Plan. The Summary Plan Description includes a section entitled "Basic Plan Information", wherein it states, "[t]he name and address of your Employer is: Change Healthcare Operations, LLC", with an address of 3055 Lebanon Pike, Suite 1000, Nashville, TN 37214. The Basic Plan Information section also defines "Employee" as "an individual who is employed by your Employer as a common law employee or, in certain cases, as a leased employee and is not terminated."

48.     Defendant furnished Plaintiff Ealy-Simon with a document entitled "Change Healthcare 401(k) Savings Plan Highlights", which states, among other things, "[a]s an employee of Change Healthcare, you are eligible to participant [sic] in the Change Healthcare 401(k) Savings Plan …, which is an important part of your Total Benefits here at Change Healthcare."

49.     Defendant furnished Plaintiff Ealy-Simon with its Code of Conduct, which states, among other things, "[c]ompliance is mandatory, not optional".

50.     For all these reasons, and more, Defendant employed or jointly employed Plaintiff Ealy-Simon.

51.     "The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991) (citations omitted). "'The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications.'" *Id.* (quoting *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989) (*per curiam*)). To determine whether an entity is an "employer" subject to the FLSA, the Court must

consider the "economic reality" of the situation. *United States Dep't. of Labor v. Cole Enters., Inc.,* 62 F.3d 775, 778 (6th Cir. 1995).

52.     As explained by the DOL, "Vertical joint employment exists where the employee has an employment relationship with one employer (typically a staffing agency, subcontractor, labor provider, or other intermediary employer) and the economic realities show that he or she is economically dependent on, and thus employed by, another entity involved in the work." Opinion Letter Fair Labor Standards Act (FLSA), 2016 WL 284582, at *2.[2]

> Examples of situations where vertical joint employment might arise include garment workers who are directly employed by a contractor who contracted with the garment manufacturer to perform a specific function, *see Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71-72 (2d Cir. 2003); nurses placed at a hospital by staffing agencies, *see Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 143-49 (2d Cir. 2008); or warehouse workers whose labor is arranged and overseen by layers of intermediaries between the workers and the owner or operator of the warehouse facility, *see Carrillo v. Schneider Logistics Trans-Loading & Distrib., Inc.*, 2014 WL 183956, at *9-15 (C.D. Cal. Jan. 14, 2014). *See also A-One Med. Servs.,* 346 F.3d at 917*; Lantern Light*, 2015 WL 3451268, at *3 (where company has contracted for workers who are directly employed by an intermediary, court applies vertical joint employment analysis to relationship between company and workers); *Berrocal v. Moody Petrol., Inc.*, 2010 WL 1372410, at *11 n.16 (S.D. Fla. Mar. 31, 2010) (vertical joint employment may exist when "an employer hires laborers through a third party labor contractor").

2016 WL 284582, at *8.

53.     The fact that each alleged employer may not have exercised each and every aspect of the test for "employer" under the law, and may have delegated some of the responsibilities to others, does not alter their status as employers; it merely makes them joint employers. *Bonnette, supra* at 1470.

54.     Whether Defendant was her employer, or joint employer, Defendant is nevertheless

---

[2] Though this DOL Opinion was withdrawn by the DOL, the DOL specifically noted that "Removal of the [DOL Opinion] does not change the legal responsibilities of employers under the [FLSA] ... as reflected in the Department's long-standing regulations and case law." USDL 17-0807 (OPA), 2017 WL 2461408.

liable for the wage violations pleaded by Plaintiff Ealy-Simon in this Complaint. *See Gonzalez v. HCA, Inc.*, 3:10-00577, 2011 WL 3793651, at \*12 (M.D. Tenn. Aug. 25, 2011 ("[A]ll joint employers are responsible, both individually and jointly, for compliance with the FLSA.") (internal quotations and citation omitted).

55.     The above well-pleaded facts all support Plaintiff Ealy-Simon's standing to sue Defendant as her joint employer and seek damages for the alleged violations under a joint employment theory. *See Parrott v. Marriott Intl., Inc.*, 17-10359, 2017 WL 3891805, at \*4 (E.D. Mich. Sept. 6, 2017) (denying motion to dismiss and finding that the plaintiffs alleged enough facts to support their joint employer theory under the FLSA).

56.     Upon information and belief, Defendant contracted for dozens, if not hundreds, of workers who were directly employed by Aerotek or other staffing companies—including Plaintiff Ealy-Simon—and who were assigned to work for Defendant as PSRs at Defendant's call center facilities, making Defendant their joint employer.

57.     Plaintiff Ealy-Simon believes, and alleges thereon, that Defendant, as her employer or joint employer, is responsible for the circumstances pleaded by Plaintiff Ealy-Simon herein, and that Defendant proximately caused the fraudulent, unlawful, unfair, and deceptive acts and wage violations complained of by Plaintiff Ealy-Simon herein.

58.     At all times herein mentioned, Defendant committed, approved of, condoned, and/or otherwise ratified each and every one of the acts or omissions complained of by Plaintiff Ealy-Simon herein.

59.     At all times herein mentioned, Defendant's acts and omissions proximately caused the complaints, injuries, and damages alleged by Plaintiff Ealy-Simon herein.

## GENERAL ALLEGATIONS

60.     Defendant employed or jointly employed Plaintiffs as PSRs in the state of Florida within the last three years.

61.     As PSRs for Defendant, Plaintiffs were compensated pursuant to an hourly wage. Plaintiffs typically worked five days per week, up to eight or more hours per day, and up to 40 or more hours per week, resulting in overtime hours on a regular basis.

62.     Upon information and belief, all PSRs are and were hourly, non-exempt employees.

63.     Throughout their employment with Defendant, Plaintiffs were required to work a substantial amount of unpaid time, including overtime, as part of their jobs as PSRs.

64.     Plaintiffs and the PSRs were responsible for, among other things: (a) turning on their computers and launching several essential computer networks, software programs, applications and phone systems before making/taking customer calls; (b) interacting with health plan members through outbound and inbound telephonic contact to review and assess health plan members' eligibility for services; (c) achieving individual growth and production goals; (d) contributing to the department's success by succeeding at departmental and quality metrics; (e) reviewing correspondences and/or inquiries from health plan members to determine needs and fast track highly qualified cases; (f) acknowledging, following-up, and closing out correspondence and/or inquiries as assigned; (g) exhibiting a professional demeanor and dependable work ethic; (h) entering data into computers and navigating the internet; (i) talking to customers and maneuvering computer applications simultaneously; (j) providing quality customer service during every interaction with health plan members; (k) maintaining a confident, helpful, and positive tone on all calls; (l) efficiently managing customer calls and multiple computer applications; (m) staying informed with current knowledge of state and federal regulatory requirements; (n)

complying with all company and department operational guidelines and policies; (o) participating in staff and operational development programs as assigned; (p) ensuring that every inbound and outbound call is accounted for in Defendant's computer systems; and (q) closing down the computer networks, software programs, applications and phone systems and shutting down their computers.

65.     Defendant requires the PSRs to work rigid schedules, usually consisting of at least eight hours per day and five days per week, resulting in overtime hours on a weekly basis.

66.     Defendant has strict expectations that the PSRs will remain on the phone during scheduled meal/rest breaks if there are not enough PSRs to cover the phones, if the call center experiences high call volume, or if the PSR is stuck on the phone with a live customer; and Defendant threatens discipline if a PSR fails to do so.

67.     Defendant requires the PSRs to begin making/taking customer calls promptly at the start of their scheduled shifts but does not accurately record the PSRs' compensable work time as required by law. Failing to accurately account and pay for all of the time actually worked by employees is a clear violation of the FLSA's record keeping requirements. *See* 29 U.S.C. § 211(c).

68.     Defendant uses a number of titles to refer to the PSRs, including but not limited to: Agent, AR Support/Customer Service, Call Center Advocates, Call Center Representatives, CSRs, Customer Service Representatives, Customer Service Representatives/Medical Appointment Setters, Customer Service Reps, Eligibility Liaisons, Health Care Representatives, Healthcare Customer Service Representatives, Healthcare Representatives, Hospital Solutions Operators, Medical Call Center Reps, Medical Records Coordinators, Patient Service Representatives, Product Support Analysts, and PSRs. No matter the title, the PSRs' job duties and responsibilities are substantially the same, namely, interacting with health plan members through outbound and

inbound telephonic contact to review and assess health plan members' eligibility for services.

69.     Defendant's PSRs use the same or substantially similar computer networks, software programs, applications and phone systems in the course of performing their job responsibilities. These programs and applications are integral and an important part of the PSRs' work, and they cannot perform their jobs without them.

70.     The PSRs' job duties and responsibilities, as well as the computer networks, software programs, applications and phone systems they are required to utilize during their shifts, are substantially the same, irrespective of their job title or the call center facility they work at, which is to say that the PSRs are similarly situated to each other, and that different job titles or job locations do not engender individualized differences that would defeat collective/class certification.

71.     Defendant's PSRs receive substantially the same training, are subject to the same disciplinary policies, and are subject to quality assurance reviews based on the same or similar criteria.

72.     Defendant expressly instructs and trains the PSRs to have all their computer networks, software programs, applications and phone systems open and ready at the start of their scheduled shifts so they can change their status in the phone system to "Ready" and begin making/taking live calls at the moment their shifts begin.

73.     If the PSRs are not logged into the phone system and "Ready" to make/take customer calls (i.e., if the PSRs are not "phone ready") promptly at the start of their scheduled shifts or at the end of their scheduled meal/rest breaks, they are subject to penalties and disciplinary action, including but not limited to: written and verbal reprimands, suspension or termination.

74.     Defendant further enforces this policy through its quality assurance grading system,

which is comprised of numerous performance metrics, including adherence (logging into the phone system and being ready to make/take customer calls promptly at the start of your scheduled shift) and call handle time (the amount of time it takes to resolve customer queries).

75.     PSRs who do not adhere to Defendant's performance metrics are ineligible for incentive compensation and are subject to penalties and disciplinary action, which again include written and verbal reprimands, suspension or termination.

76.     These policies reinforce that PSRs are required to have the essential computer networks, software programs, applications and phone systems open and ready at the start of their shifts so they can change their status to "Ready" and begin making/taking live calls at the moment their shifts begin.

77.     Defendant uses the software programs "SAP Fieldglass" and "Kronos" to track PSRs' hours worked for purposes of compensation. However, because Defendant fails to accurately record the PSRs' work time, Defendant's compensation system fails to properly account for and compensate the PSRs for all time worked, including their overtime hours, during each day and during each workweek.

78.     Defendant expressly instructed Plaintiff Ealy-Simon to track and submit her hours worked by entering her time into "SAP Fieldglass," a cloud-based software platform that allows companies to manage external workforces, including contractors, temporary workers, contingent labor, and statement of work (SOW) employees. On the other hand, Defendant expressly instructed Plaintiff Wilson to use the electronic timekeeping system "Kronos" to track her hours worked by punching in and out of Kronos before and after her shifts. Upon information and belief, all PSRs who were hired and directly employed by Aerotek or other staffing agencies were required to track and submit their time using SAP Fieldglass or similar cloud-based software platforms; while all

PSRs who were hired and directly employed by Defendant were required to track their time by punching in/out of Kronos.

79. Regardless of whether the PSRs tracked and submitted their time through SAP Fieldglass or by punching in/out of Kronos, the hours reflected on the PSRs' pay stubs are not accurate, are contrived by Defendant, and are not related to the hours the PSRs actually worked for Defendant. This is because Defendant requires the PSRs to perform compensable work tasks before and after their shifts and during their unpaid meal periods, but compensates the PSRs only for the time they are connected to the phone system and are "Ready" to make/take customer calls, meaning that the PSRs are only paid for time spent on the phones and are not paid for any time spent turning on their computers and launching the computer networks, software programs, applications and phone systems necessary for the performance of their work.

80. Because of Defendant's compensation policy, Plaintiffs and all other PSRs are deprived of pay for compensable time worked, including overtime.

**A.** **Pre-Shift Off-the-Clock Work**

81. Before their scheduled shifts and before making/taking customer calls, Defendant's PSRs are required to boot-up their computers and then launch and log into numerous essential computer networks, software programs, applications and phone systems in order to access information and make/take customer calls. The pre-shift startup and login process takes substantial time on a daily basis, in the range of 10 to 20 minutes per shift, or even longer when technical issues arise or when the programs/applications undergo automatic updates. Before each shift and before making/taking live phone calls, PSRs must undertake the following essential work tasks:

- Locate their workstation and turn on the computer;

- Unlock the computer screen by punching in an assigned username and passcode;

- Log into Citrix;

- Log into Epic;

- Ensure OCI Jar file is up and running on startup;

- Ensure softphone is open on desktop and that the softphone adaptor is plugged in;

- Authenticate Salesforce from the NYULMC site;

- Answer the security question to verify your identity;

- Log into phone system through the softphone in Salesforce;

- Log into various internal and external email, messaging and communications systems, including Microsoft Outlook, Skype for Business, Microsoft Teams, and the NYU Langone email system;

- Read and respond to work-related emails, chats and instant messages, including important notices, work instructions or training updates; and

- Set your state to "Ready" to accept calls using the adapter.[3]

82.     This mandatory boot-up and login process is performed *before* the PSRs' scheduled shifts, as Defendant expressly instructs and trains the PSRs to have all their computer networks, software programs, applications and phone systems open and ready at the start of their shifts to ensure they are prepared to make/take live calls (i.e., are "phone ready") at the moment their shifts begin. Consequently, PSRs must arrive at their workstations approximately 10 to 20 minutes before their scheduled shifts to complete the startup and login process.

83.     Defendant's PSRs are not compensated for this time because Defendant does not begin paying the PSRs until *after* they complete the time-consuming process of booting up their computers, launching and logging into the essential computer networks, software programs, applications and phone systems, and changing their status to "Ready." This policy results in PSRs performing no less than 10 to 20 minutes of unpaid pre-shift work each and every day.

---

[3] PSRs who clock in/out using Kronos must undertake the additional step of launching and logging into Kronos.

84. Defendant expressly instructed Plaintiff Ealy-Simon and other PSRs to track and submit their hours worked by entering their time into SAP Fieldglass, but not to begin recording their time until *after* they complete the above-described boot-up and login activities and change their status in the phone system to "Ready," otherwise Defendant would reject the PSRs' recorded time and instruct the PSR to correct and resubmit their time through SAP Fieldglass.[4]

85. Defendant expressly instructed Plaintiff Wilson and other PSRs to use the electronic timekeeping system Kronos to track their hours worked by punching in and out of Kronos before and after their shifts, but not to punch into Kronos until *after* they complete the above-described boot-up and login activities and just before changing their status in the phone system to "Ready."

86. Hence, regardless of whether the PSRs tracked and submitted their time using SAP Fieldglass or by punching in and out of Kronos, they were not compensated for any time spent booting up their computers and launching and logging into the essential computer networks, software programs, applications and phone systems.

87. The unpaid off-the-clock work performed prior to each shift by Plaintiffs and all other PSRs directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as PSRs.

**B.**     **Meal-Period Off-the-Clock Work**

88. Defendant promises the PSRs one unpaid 30-minute meal period each and every shift.

89. Under federal law, in order to deduct an unpaid meal period from an employee's

---

[4] On numerous occasions, Defendant's managers/supervisors rejected Plaintiff Ealy-Simon's recorded time and expressly instructed her to "correct" and resubmit her time.

compensable time, an employee must be completely relieved of his or her employment duties for the entire meal break. 29 C.F.R. § 785.19(a) states:

> ***Bona fide meal periods***. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be *completely relieved* from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.

(emphasis added).

90.    Instead of complying with the law, Defendant does not provide PSRs with bona fide meal periods because it requires the PSRs to return to their computer stations prior to the end of their meal breaks to unlock their computer screens and log back into the necessary software programs and applications needed to begin taking customer calls promptly at the end of their meal breaks.

91.    The time spent by PSRs unlocking their computers and logging back into the software programs and applications prior to the end of their unpaid meal breaks—a process that takes approximately 5-10 minutes per day, or more, depending on whether they were kicked out of their computer programs while on lunch—goes uncompensated because Defendant does not resume paying its PSRs until *after* they log back into the software programs/applications and change their status in the phone system from "Meal" to "Ready."

92.    This policy results in PSRs performing no less than 5-10 minutes of unpaid meal-period work each and every day.

93.    The off-the-clock work performed by PSRs during their unpaid meal breaks directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as PSRs.

### C.   Post-Shift Off-the-Clock Work

94.     After their scheduled shifts and after making/taking their last customer call, the PSRs are required to change their status in the phone system to "End of Shift," log out of and close down the essential computer networks, software programs, applications and phone systems, and shut down their computers. The post-shift log-out and shutdown process takes substantial time on a daily basis, in the range of 5 minutes per shift, or more, if the PSR experiences technical problems with the computer, software or applications.

95.     The PSRs are not compensated for this time because Defendant stops paying the PSRs once the PSR changes his or her status in Defendant's phone system to "End of Shift." This policy results in PSRs performing no less than 5 minutes of unpaid post-shift work each and every day.

96.     Defendant expressly instructed Plaintiff Ealy-Simon and other PSRs to stop tracking their time in SAP Fieldglass the moment they change their status in the phone system to "End of Shift." Similarly, Defendant expressly instructed Plaintiff Wilson and other PSRs to clock-out of Kronos immediately before changing their status in the phone system to "End of Shift." Hence, regardless of whether the PSRs tracked and submitted their time using SAP Fieldgalss or by punching in and out of Kronos, they were not compensated for any time spent closing down the essential computer networks, software programs, applications and phone systems and shutting down their computers.

97.     The unpaid work performed subsequent to each shift by Plaintiffs and all other PSRs directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as PSRs.

**D.** **Defendant Benefited from the Uncompensated Off-the-Clock Work and Suffered and Permitted it to Happen**

98.     At all relevant times, Defendant directed and directly benefited from the work performed by Plaintiffs and similarly situated employees in connection with the above-described pre-shift, meal-period and post-shift activities performed by the PSRs.

99.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of the PSRs.

100.     At all relevant times, Defendant was able to track the amount of time PSRs spent in connection with the pre-shift, meal-period and post-shift activities. However, Defendant failed to do so and failed to compensate PSRs for the off-the-clock work they performed.

101.     At all relevant times, PSRs were non-exempt hourly employees, subject to the requirements of the FLSA.

102.     At all relevant times, Defendant used its attendance and adherence policies against the PSRs in order to pressure them into performing the pre-shift, meal-period and post-shift off-the-clock work.

103.     Defendant expressly trained and instructed the PSRs to perform the above-described pre-shift activities *before* the start of their scheduled shifts, to ensure they were prepared to make/take live calls (i.e., were "phone ready") at the moment their shifts began.

104.     At all relevant times, Defendant's policies and practices deprived PSRs of wages owed for the pre-shift, meal-period and post-shift activities they performed. Because the PSRs typically worked 40 hours or more in a workweek, Defendant's policies and practices also deprived them of overtime pay.

105.     Defendant knew or should have known that the time spent by PSRs in connection with the pre-shift, meal-period and post-shift activities was compensable under the law. Indeed,

given the explicit guidance set forth in DOL Fact Sheet #64, as cited herein, there is no conceivable way for Defendant to establish that it acted in good faith.

106.     Despite knowing PSRs performed work before and after their scheduled shifts and during their unpaid meal breaks, Defendant failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

107.     Unpaid wages related to the off-the-clock work described herein are owed to the PSRs at the FLSA mandated overtime premium of one and one-half times their regular hourly rates because PSRs regularly worked in excess of 40 hours in a workweek.

## FLSA COLLECTIVE ACTION ALLEGATIONS

108.     Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> *All similarly situated current and former Patient Service Representatives and similar job titles who work or have worked for Defendant at any of its call center facilities at any time during the three years preceding the filing of this Complaint through judgment.*

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this definition if necessary.

109.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and other similarly situated PSRs.

110.     Excluded from the FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

111.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and the FLSA Collective were not paid premium overtime compensation when they worked beyond 40 hours in a workweek.

112.     Defendant assigned and/or was aware of all the work that Plaintiffs and the FLSA

Case 3:20-cv-00521   Document 1   Filed 06/22/20   Page 23 of 33 PageID #: 23

Collective performed.

113.     As part of its regular business practices, Defendant intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

       a.      Willfully failing to pay Plaintiffs and the FLSA Collective premium overtime wages for hours worked in excess of 40 hours per workweek; and

       b.      Willfully failing to record all of the time that Plaintiffs and the FLSA Collective worked for the benefit of Defendant.

114.     Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and the FLSA Collective overtime premiums for hours worked in excess of 40 per workweek.

115.     Defendant's unlawful conduct has been widespread, repeated and consistent.

116.     A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy or plan; and (d) their claims are based upon the same factual and legal theories.

117.     The employment relationships between Defendant and every proposed FLSA Collective member are the same. The key issues – the amount of uncompensated pre-shift start-up/log-in time, unpaid meal-period time, and the amount of post-shift shut-down/log-out time owed to each employee – do not vary substantially among the proposed FLSA Collective members.

118.     Many similarly situated current and former PSRs have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and

the opportunity to join it.

119.    Court-supervised notice of this lawsuit should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

120.    Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's personnel and payroll records.

121.    Plaintiffs estimate the proposed FLSA Collective, including both current and former employees over the relevant period, will include hundreds of workers. The precise number of FLSA Collective members should be readily ascertainable from a review of Defendant's personnel and payroll records.

## RULE 23 CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of the following class:

> *All similarly situated current and former Patient Service Representatives and similar job titles who work or have worked for Defendant at any of its call center facilities at any time during the applicable statutory period*.

 (hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

123.    Excluded from the Rule 23 Nationwide Class are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

124.    The Rule 23 Nationwide Class is so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiffs reasonably estimate there are hundreds of Rule 23 Nationwide Class members. Rule 23 Nationwide Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

125. There is a well-defined community of interest among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions include, but are not limited to, the following:

    a.    Whether the time Rule 23 Nationwide Class members spent on pre-shift, meal-period and post-shift off-the-clock work activities is compensable under applicable law;

    b.    Whether Rule 23 Nationwide Class members are owed wages for time spent performing off-the-clock work activities, and if so, the appropriate amount thereof; and

    c.    Whether Defendant's non-payment of wages for all compensable time amounted to a breach of contract and/or unjust enrichment.

126. Plaintiffs' claims are typical of those of the Rule 23 Nationwide Class in that they and all other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Nationwide Class members' claims, and their legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

127. Plaintiffs will fully and adequately protect the interests of the Rule 23 Nationwide Class and have retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

128. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer.

Prosecution of this case as a Rule 23 class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

129.    This case will be manageable as a Rule 23 class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage and damages issues in this case to be resolved with relative ease.

130.    Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

131.    Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

<u>**COUNT I**</u>
<u>**29 U.S.C. § 216(b) COLLECTIVE ACTION**</u>
<u>**VIOLATION OF FLSA, 29 U.S.C. § 201 *et seq*.**</u>
<u>**FAILURE TO PAY OVERTIME WAGES**</u>

132.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

133.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

134.    At all times relevant to this action, Plaintiffs and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

135.    Plaintiffs and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

136.    Plaintiffs and the FLSA Collective either: (1) engaged in commerce; or (2) engaged

in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

137. At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

138. At all times relevant to this action, Defendant required Plaintiffs and the FLSA Collective to perform no less than 20 to 35 minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

139. The off-the-clock work performed every shift by Plaintiffs and the FLSA Collective was an essential part of their jobs, and these activities and the time associated with these activities were not *de minimis*.

140. In workweeks where Plaintiffs and other FLSA Collective members worked 40 hours or more, the uncompensated off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of one and one-half times each employee's regular hourly wage, including shift differentials and nondiscretionary incentive pay where applicable. 29 U.S.C. § 207.

141. Defendant's FLSA violations were knowing and willful. Defendant knew or could have determined how long it takes the PSRs to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but deliberately chose not to.

142. The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

143.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

144.    At all times relevant to this action, Defendant had a binding and valid contract with Plaintiffs and every other Rule 23 Nationwide Class member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Nationwide Class members performed on Defendant's behalf.

145.    Defendant's contractual promises to pay Plaintiffs and each Rule 23 Nationwide Class member's applicable hourly rate is evidenced by, among other things, each pay stub issued to Plaintiffs and the Rule 23 Nationwide Class members.

146.    Plaintiffs and every other Rule 23 Nationwide Class member accepted the terms of Defendant's contractual promises and performed under the contract by doing their jobs and carrying out the work they performed each shift, including the unpaid off-the-clock work that was required of them, accepted by Defendant, and that they performed, in connection with the pre-shift, meal-period and post-shift activities described herein.

147.    By not paying Plaintiffs and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, Defendant systematically breached its contracts with Plaintiffs and each member of the Rule 23 Nationwide Class.

148.    Plaintiffs' and the Rule 23 Nationwide Class members' remedies under the FLSA are inadequate in this case to the extent Defendant paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure "gap time" claims).[5]

---

[5] "Gap time" refers to time that is not covered by the FLSA's overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the FLSA's minimum wage

149.     As a direct and proximate result of Defendant's contractual breaches, Plaintiffs and every other Rule 23 Nationwide Class member have been damaged in an amount to be determined at trial.

**COUNT III**
**RULE 23 NATIONWIDE CLASS ACTION**
**UNJUST ENRICHMENT**

150.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

151.     This Count is pled in the alternative to Count II, *supra*, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

152.     At all times relevant to this action, Defendant promised Plaintiffs and every other Rule 23 Nationwide Class member a pre-established regular hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Nationwide Class members performed for the benefit of Defendant.

153.     Plaintiffs and every other Rule 23 Nationwide Class member relied upon Defendant's promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

154.     By not paying Plaintiffs and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the off-the-clock work they performed each shift, Defendant was unjustly enriched.

155.     Plaintiffs and the Rule 23 Nationwide Class members performed off-the-clock work tasks at the request of, for the benefit of, and without objection by, Defendant.

156.     Defendant received and accepted the off-the-clock work services from Plaintiffs and every other Rule 23 Nationwide Class member and enjoyed the benefits derived therefrom,

---

provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked.

such as increased profits, without having paid for the same.

157.    Upon information and belief, Defendant used the monies owed to Plaintiffs and every other Rule 23 Nationwide Class member to finance its various business ventures or pay its equity owners.

158.    Defendant has been unjustly enriched by the retention of monies received pursuant to the services Plaintiffs and the Rule 23 Nationwide Class performed for Defendant's benefit, without having compensated Plaintiffs and the Rule 23 Nationwide Class for the same.

159.    Plaintiffs and the Rule 23 Nationwide Class suffered detriment due to Defendant's failure to compensate them for the off-the-clock work described herein, in that Plaintiffs and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

160.    As a direct and proximate result of Defendant's actions, Plaintiffs and every other Rule 23 Nationwide Class member suffered damages, including but not limited to, loss of wages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the putative FLSA Collective and Rule 23 Nationwide Class, request judgment as follows:

a.    Certifying this action as a collective action in accordance with 29 U.S.C. § 216(b) with respect to Plaintiffs' FLSA claims (Count I);

b.    Certifying this action as a class action (for the Rule 23 Nationwide Class) pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiffs' breach of contract and unjust enrichment claims (Counts II-III);

c.    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, email addresses, phone numbers and dates of employment of all FLSA Collective members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, apprising the FLSA Collective members of their rights by law to join and participate in this lawsuit;

d.    Designating Plaintiffs as the representatives of the FLSA Collective and

undersigned counsel as class counsel for the same;

e.        Designating Plaintiffs as the representatives of the Rule 23 Nationwide Class and undersigned counsel as class counsel for the same;

f.        Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

g.        Declaring Defendant's violations of the FLSA were willful;

h.        Declaring Defendant breached its contracts with Plaintiffs and the Rule 23 Nationwide Class (or, in the alternative, that Defendant was unjustly enriched) by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

i.        Granting judgment in favor of Plaintiffs and against Defendant and awarding Plaintiffs and the FLSA Collective and the Rule 23 Nationwide Class the full amount of damages and liquidated damages available by law;

j.        Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

k.        Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

l.        Awarding such other and further relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a jury trial pursuant to Fed. R. Civ. P. 38.

Dated: June 22, 2020                              Respectfully Submitted,

                                          s/ Gregory F. Coleman

                                          Gregory F. Coleman, BPR No. 014092
                                          Lisa A. White, BPR No. 026658
                                          GREG COLEMAN LAW PC
                                          800 S. Gay Street, Suite 1100
                                          Knoxville, TN 37929
                                          Phone: (865) 247-0080
                                          Fax: (865) 522-0049
                                          greg@gregcolemanlaw.com
                                          lisa@gregcolemanlaw.com

                                          Jason J. Thompson (will *pro hac vice*)

Rod M. Johnston (will *pro hac vice*)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
jthompson@sommerspc.com
rjohnston@sommerspc.com

*Attorneys for Plaintiffs and the putative*
*Class/Collective action members*